## THE CITY OF SEATTLE.

### PACIFIC COAST CO. v. JENKINS.

(Circuit Court of Appeals, Ninth Circuit. October 29, 1906.)

No. 1,218.

1. SHIPPING—VISITORS ON BOARD VESSEL—DUTY TO AFFORD OPPORTUNITY TO LAND.

It is the duty of the owners or master of a vessel, by whose permission, or at whose implied invitation, a visitor has come on board at a port, to exercise reasonable care to avoid injury to such visitor, and to give him a reasonable opportunity to go on shore before the vessel departs; the measure of such duty being affected by the magnitude of the injury which will otherwise result to the visitor.

2. SAME—CARRYING VISITOR AWAY—LIABILITY OF VESSEL.

Respondent's steamship, on a voyage from Alaska to Seattle, in October, stopped at an Alaskan port in the night, and libelant, who was a minister residing there with his family, without objection on the part of the officers. went on board to see a passenger. The signal for starting was given, but, before libelant reached the gang plank, it had been taken in, and the master, when appealed to, refused to put libelant ashore, and carried him to Seattle, which was reached several days later. *Held* that, under the circumstances, and in view of the serious inconvenience and loss which would necessarily result to libelant from taking him such distance without preparation or the knowledge of his family, it was the duty of the master to afford him an opportunity to go ashore, even if, as claimed, the vessel had already swung from the wharf before the master had knowledge of the situation, and a relanding would have been necessary; and that the vessel was liable in damages.

Appeal from the District Court of the United States for the Northern Division of the Western District of Washington.

The appellee filed a libel against the steamship City of Seattle, her engines and boilers, tackle, apparel, and furniture, and against Norman Nicholson, master of said vessel, for damages caused to the appellee by reason of the alleged negligence of the master of said vessel.

The appellee alleges that he is a minister of the town of Ketchikan, in the District of Alaska; that on the 10th day of October, 1904, the steamship City of Seattle, engaged as a common carrier of passengers and merchandise between the port of Juneau, Alaska, and the port of Seattle, Wash., was making a return trip to said port of Seattle, and landed at the town of Ketchikan at about the hour of 3 a. m. of said day; that there was on board said steamship as a passenger an orphan child who was being brought to the United States for the purpose of attending school; that appellee was professionally interested in the well-being of said child, and, while said vessel was fastened to the wharf, he, "without objection from any one and with the knowledge of one or more of the officers and crew of said vessel, passed down its gang

plank and went aboard the same to see * * * and inquire concerning, said child"; that while talking with his friends the ship's whistle began to blow; that he at once, and while the same was blowing, went most quickly to the ship's side, where the only gang plank was, and then found the same had been pulled in, and that there was no way by which he could safely or at all leave the vessel and reach the wharf; that he called loudly to the master and officers and crew of the vessel, saying that he must be put ashore, stating his name, calling, and residence; that at the same time an officer shouted to the captain that there was still one man to go off; that one or more officers or members of the crew took up the cry, and thereupon the master inquired who appellee was, and, although he was then told by appellee and others, and appealed to personally by the appellee, and although the ship's lines had not even then been cast off, the master refused to throw out the gang plank to the wharf, or to provide other means by which appellee could leave the vessel, and appellee was thereupon "knowingly, unlawfully, arbitrarily, forcibly, and against his will restrained and deprived of his liberty, and conveyed in said vessel from said town of Ketchikan to the port of Seattle, where said vessel arrived several days thereafter."

The appellee further alleges in his libel that he was not properly clad or provided for the journey; that his wife and family were left in Ketchikan, his wife being in poor health at that time, without notice of his sudden departure or whereabouts until several days thereafter when he could write to her; that his work as a clergyman in charge of a mission church, and in carrying on a church paper, and other works and enterprises, were interrupted and stopped for a period of about 10 days; that during those 10 days appellee suffered much annoyance, humiliation, distress and pain of mind, and bodily discomforts and inconveniences, and an outlay of money for his return to Ketchikan, all of which, it is alleged, was caused by the negligence and willful conduct of the master. He prays for damages in the sum of $500.

The appellants, by their answer, admit that appellee boarded said vessel without any objection from them while it was fastened at said wharf, but deny negligence in the carrying away of appellee on board said vessel. And, as matter of affirmative defense, appellants allege that the vessel touched at the wharf at Ketchikan about 3:45 a. m. of October 10, 1904; that at said time, and when the said vessel left the wharf, there was a strong southeasterly wind, accompanied by heavy rain, and so dark that it was necessary to sound the whistle in order to ascertain the distance from shore; that the vessel remained fast to the dock at Ketchikan for some considerable time; that, a few moments before leaving, the master of said vessel blew her whistle as a signal that the vessel was about to leave, and thereafter ordered the mate to let go the stern line and haul in the gang plank; that it took several minutes to haul in the stern line, during which time the appellee did not appear on the deck of the vessel; that, after the stern line was hauled in, and the head line had been loosed, and while the eye of said line was in the hand of a man then on the dock, the master was informed by the mate that there was a man on board who desired to get off; that the master then gave orders to hold the head line, but immediately noticed that the strong wind threw the vessel's stern out into the bay, and that, before the heaving lines could be made ready and bent onto the stern line, the ship would be broadside in the channel and in a dangerous position, owing to the dark and stormy night and the immediate vicinity of a rocky shore; that the appellee then came on deck and commanded the master of the vessel to put him off, which it was not then feasible for the master to do, and the vessel therefore proceeded upon her voyage to Seattle, the appellee receiving the same care and attention as a first-class passenger, and without any expense to him. It is further alleged that the carrying off of the appellee was caused by his own fault and negligence, in not leaving the ship after the blowing of the whistle, when ample opportunity was given him to do so. It is also alleged that, prior to the vessel's leaving the dock, the master of the vessel did not know that appellee was on board.

The appellee excepted to the answer, on the ground that it did not state facts constituting any defense to the cause of damage set forth in the libel.

The court held that the answer admitted all of the substantial facts constituting libelant's cause of complaint, and failed to set forth matters sufficient to justify the wrong committed in carrying away the appellee against his will. The court also stated that, in its opinion, the claim for $500 damages was reasonable. But it was the opinion of the court that, in consideration of the fact that the affirmative defense alleged that reasonable warning was given before the gang plank was withdrawn, and that the appellee was himself negligent in unreasonably delaying his departure from the vessel, the case was brought, if these allegations were true, within the application of the rule of maritime law that, where an injury is a consequence of mutual fault, the damages should be divided. The exceptions were overruled, and the appellee given an option to take a decree for $250 and one-half usual taxable damages, or to require the claimant to submit evidence upon the issue joined by the pleadings as to contributory negligence. The appellee moved for a decree in accordance with the decision of the court. The motion was granted, and decree rendered. From this decree an appeal was taken to this court.

S. H. Piles, Geo. D. Donworth, James B. Howe, and Chas. H. Farrell, for appellants.

Austin E. Griffiths, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge, after stating the case as above, delivered the opinion of the court:

The appellants, by their answer, admit that the vessel in her regular course touched at the wharf at Ketchikan; that no objection was made to persons coming on board to visit passengers while she was there; that before leaving the wharf a warning whistle was always sounded; and that the appellee boarded the vessel with their implied permission. The substance of their affirmative defense is that the appellee had ample opportunity, after the whistle was sounded, to have left the vessel, and that, when the master became aware of his presence, it was then not feasible to land him, for the reason that the night was dark and stormy; that, after the stern line had been hauled in and the head line had been loosed, the wind threw the vessel's stern out into the bay; and that, before the heaving lines could have been made ready and bent on the stern line, the ship would have been broadside in the channel and in a dangerous position. Was it error to enter a decree dividing the damages and adjudging that the appellants pay one-half thereof, in the face of the facts so alleged? We think there is stated in these allegations no fact from which the court can see that the conditions of weather and tide were different at the time of leaving the dock from the conditions that prevailed before touching there, or that it would have been more dangerous or difficult to make a second landing than it had been to make the first.

The appellee went upon the steamer upon the implied invitation of the owners. The latter were bound to exercise ordinary care to avoid injury to him. St. Louis I. M. & S. R. Co. v. Fairbairn, 48 Ark. 491, 4 S. W. 50; Orcutt v. Northern Pacific R. R. Co., 45 Minn. 368, 47 N. W. 1068; Lucas v. New Bedford & T. R. Co., 6 Gray (Mass.) 64, 66 Am. Dec. 406; Griswold v. Chicago & N. W. R. Co., 64 Wis. 652, 26 N. W. 101. It is true that it is held that, where one gets upon a train at a station to meet or aid a passenger, and is carried away by the train, the railroad company, in the absence of knowledge by its

servants of his purpose, is not responsible in damages for an injury which he may sustain in attempting to leave the train after it has started on its way, and that such a visitor is bound to know of the movement of the train. Coleman v. Georgia R. & Bkg. Co., 84 Ga. 1, 10 S. E. 450; Little Rock & Fort S. R. Co. v. Lawton, 55 Ark. 428, 18 S. W. 543, 15 L. R. A. 434, 29 Am. St. Rep. 48; Texas & P. Ry. Co. v. McGilvary (Tex. Civ. App.) 29 S. W. 67; International & G. N. R. Co. v. Satterwhite (Tex. Civ. App.) 38 S. W. 401. But, in cases where notice of the presence and purpose of the visitor has come to the servants of the carrier who are operating the train, the rule is otherwise, and they are bound to give him a reasonable opportunity to depart. Houston v. Gate City R. Co., 89 Ga. 272, 15 S. E. 323. In Griswold v. Chicago & Northwestern Railroad Co., 64 Wis. 652, 26 N. W. 101, it was held that, had any of the operatives of the train been informed or had reason to know that the plaintiff was on board of one of the cars for such a purpose, the company would have owed him the duty to have delayed the train a reasonable time for him to get off. And, in Missouri, K. & T. Ry. Co. v. Miller (Tex. Civ. App.) 39 S. W. 583, the court said:

"It became defendant's duty, if it had allowed or indulged the act that plaintiff was engaged in, to so regulate the movement of the train as would admit of his getting off without injury to himself."

If it is the duty of a carrier to delay starting under such circumstances, it would seem to be equally its duty, after having started, to stop and permit a visitor to leave, and it is but carrying that doctrine to its legitimate conclusion to hold that, under circumstances demanding such a degree of care, it might become the duty of a carrier, after starting, to stop and return to the starting place, if necessary to prevent serious injury to the visitor. Obviously the magnitude of the threatened injury is a factor in determining what, under such circumstances, the carrier's duty shall be. Notwithstanding the appellee's negligence as alleged in the answer, the appellants owed him the duty not to wantonly injure him, and we think that, when knowledge came to the master of the steamer that the appellee was on board and demanded to be put ashore, it was his duty, in view of the long voyage he was about to undertake and the very considerable injury it would inflict upon the appellee to carry him, unprepared as he was, away from his family and his occupation for so long a period of time, to bring the vessel back to the dock for the purpose of permitting him to leave. The appellants, it is true, by their answer allege that it was not practicable to do this, but the facts which they set forth are insufficient to show that it was not practicable.

The decree of the District Court is affirmed.

MORROW, Circuit Judge, did not participate in the decision.